Stephanie E. Liebner (VA Bar No. 90647)
Carlton B. Mosley (DC Bar No. 1644552)
Sally Tieu (CA Bar No. 346034)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Stop GAO-5K21
Washington, DC 20580
Phone: (202) 640-0963 (Liebner)
Email: sliebner@ftc.gov (Liebner)
Fax: (202) 326-3395

*Attorneys for Plaintiff Federal Trade Commission*

*Additional Counsel Listed on Signature Page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION; THE ATTORNEYS GENERAL OF THE STATES OF COLORADO, FLORIDA, ILLINOIS, IOWA, NEBRASKA, OKLAHOMA and UTAH; THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through LOS ANGELES COUNTY COUNSEL DAWYN R. HARRISON and SAN FRANCISCO CITY ATTORNEY DAVID CHIU<br><br>Plaintiffs,<br><br>v.<br><br>TOAST, INC., a corporation;<br><br>TOAST PROCESSING SERVICES, LLC, a limited liability company;<br><br>STRATEX HOLDCO, LLC, a limited liability company;<br><br>STRATEGY EXECUTION PARTNERS LLC, a limited liability company; and<br><br>XTRA CHEF, LLC, a limited liability company,<br><br>Defendants. | Case No. 3:26-cv-12705<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"), the Attorneys General of the States of Colorado, Florida, Illinois, Iowa, Nebraska, Oklahoma, and Utah (the

"Attorneys General"), and the People of the State of California, acting by and through Los Angeles County Counsel Dawyn R. Harrison and San Francisco City Attorney David Chiu (the "People of the State of California"), (collectively, "Plaintiff States") (together with the FTC, "Plaintiffs") for their Complaint allege:

1. The FTC brings this action for Defendants' violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403, in connection with Defendants' false or misleading claims regarding their subscription services and financing products, their failure to make required disclosures and to provide simple mechanisms for customers to cancel their subscription services, and their charging of customers without their consent. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404.

2. The Plaintiff States bring this action with the FTC pursuant to ROSCA, which provides "the attorney general of a State . . . alleging a violation of this chapter . . . that affects or may affect such State or its residents may bring an action on behalf of the residents of the State in any United States district court for the district in which the defendant is found . . . or wherever venue is proper . . . to obtain appropriate injunctive relief." 15 U.S.C. § 8405(a). Additionally, the Plaintiff States allege that Defendants' false or misleading claims discussed below, and their charging of customers without their consent, constitute unfair and/or deceptive acts and practices that are prohibited by the below enumerated state consumer protection laws. These laws authorize the Plaintiff States to seek injunctive relief, rescission or reformation of contracts, restitution, damages, the refund of monies paid, disgorgement of ill-gotten monies, or other equitable relief to stop ongoing fraud, deception, or unfair practices caused by Defendants' state law violations. These laws also authorize the Plaintiff States to obtain civil penalties, attorneys' fees, expenses, and/or costs.

3. Plaintiff, the Attorney General of Colorado, brings this action for violations of the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101 *et seq.* and ROSCA, 15 U.S.C.

§ 8405. For these violations, Colorado seeks relief, including a permanent injunction, monetary relief, civil penalties, and other relief pursuant to the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-110 and 112 and ROSCA. The Colorado Attorney General brings these claims in his official law enforcement capacity as authorized by Colorado law. Colo. Rev. Stat. § 24-31-101(1)(i)(II).

4. Plaintiff, Office of the Attorney General James Uthmeier, State of Florida, Department of Legal Affairs ("Florida Attorney General") brings this action as an enforcing authority of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), as defined in Section 501.203(2), Florida Statutes, against Defendants for injunctive relief, consumer restitution, civil penalties, attorney's fees and costs, and other statutory and equitable relief, brought pursuant to Sections 501.207(1)(b) and 501.207(3), Florida Statutes. The Florida Attorney General has reviewed the matters alleged herein, and the head of the enforcing authority has determined that this enforcement action serves the public interest.

5. Plaintiff State of Illinois is one of the fifty sovereign states of the United States. Attorney General Kwame Raoul is the duly elected and qualified Attorney General and brings this action in his official capacity for and on behalf of the People of the State of Illinois, pursuant to the Provisions of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act"), 815 ILCS 505/7, and his common law authority as Attorney General to represent the People of the State of Illinois. The Illinois Attorney General believes this action to be in the public interest of the citizens of the State of Illinois and brings this lawsuit pursuant to Section 7(a) of the Illinois Consumer Fraud Act, 815 ILCS 505/7(a).

6. Plaintiff State of Iowa is a sovereign state and brings this action for Defendants' violations of Iowa Code § 714.16, the Iowa Consumer Fraud Act. Iowa Code § 714.16(7) expressly authorizes Brenna Bird, as Attorney General of the State of Iowa, to bring this action under Iowa's Consumer Fraud Act.

7. Plaintiff State of Nebraska is a sovereign state. Michael T. Hilgers, as Attorney General of the State of Nebraska, is expressly authorized to bring this action under Nebraska's Uniform Deceptive Trade Practices Act on behalf of the State of Nebraska to protect the state and

its residents from Defendants' unlawful business practices. Neb. Rev. Stat. §§ 87-303.05(1), 303.11(1).

8. Plaintiff State of Oklahoma, *ex rel.* Attorney General Gentner Drummond ("Oklahoma Attorney General") is a sovereign state and the Oklahoma Attorney General is expressly authorized to bring this action under the Oklahoma Consumer Protection Act. Okla. Stat. tit. 15, § 756.1.

9. The Attorney General of the State of Utah brings this action in the name of the State of Utah and on behalf of the people of the State of Utah pursuant to the authority granted by Utah Code § 13-11a-4(1)(a)(i). For these violations, Plaintiff State of Utah seeks relief, including a permanent injunction, monetary relief, civil penalties, and other relief pursuant to the Utah Truth in Advertising Act. Utah Code § 13-11a-4.

10. Plaintiff, the People of the State of California, brings this action against Defendants for injunctive relief, restitution, and civil penalties for Defendants' acts or practices in violation of California's Business and Professions Code section 17200 *et seq.* (the "Unfair Competition Law" or "UCL") and Business and Professions Code section 17500 *et seq.* (the "False Advertising Law" or "FAL").

## **SUMMARY OF THE CASE**

11. Toast, is a restaurant management and financial technology ("fintech") company that markets and sells point-of-sale hardware, software, and payment processing services to small businesses in the restaurant industry. Toast sells its software as a subscription service, which renews automatically, and charges consumers on a recurring basis. Toast also markets and sells financing products, called Toast Capital Loans, to existing Toast customers.

12. In numerous instances, Toast has used false claims to convince consumers to enroll in its subscription services. Specifically, Toast promises that Toast customers pay "$0" for Toast products under certain pricing plans. Toast also promises customer support "24/7/365." In fact, none of Toast's hardware is $0, and Toast customers frequently claim that they cannot get customer support at *any* hour of the day

13. Additionally, Toast has failed to provide a simple method for customers to cancel

their subscription services, instead imposing a series of onerous hurdles, which compound to deter and prevent customers from stopping recurring charges. Even when customers have managed to navigate Toast's Byzantine cancellation process and canceled their accounts, in many instances, Toast has hit them with unexpected high-dollar early termination fees ("ETFs") or continued to charge them for subscription services without consent. Toast has also hidden order processing fees from restaurants and their customers.

14. At least tens of thousands of consumers have complained about these issues to the FTC, online, and directly to Toast.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355. This Court also has subject matter jurisdiction over the supplemental state law claims asserted by the Plaintiff States under 28 U.S.C. § 1367.

16. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

## INTRADISTRICT ASSIGNMENT

17. Assignment to the San Francisco Division is proper because at all relevant times Defendants have conducted business, marketed, and sold their services throughout the United States, including throughout the county of San Francisco.

## PLAINTIFFS

18. The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces ROSCA, 15 U.S.C. §§ 8401–05, which, *inter alia*, prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements to protect consumers. A negative option is an offer in which the seller treats a consumer's silence—their failure to reject an offer or cancel an agreement—as consent to be charged for goods or services. 16 C.F.R. § 310.2(w).

19. The Attorneys General are the chief legal officers of their respective jurisdictions. Los Angeles County Counsel Dawyn R. Harrison and San Francisco City Attorney David Chiu are authorized to enforce state consumer protection laws on behalf of The People of the State of California.

20. The Plaintiff States bring this action pursuant to consumer protection and/or business regulation authority conferred on them by the following state laws and/or pursuant to *parens patriae* and/or common law authority:

| | |
|---|---|
| California | CAL. BUS. & PROF. CODE § 17200 *et seq.* and § 17500 *et seq.* |
| Colorado | COL. REV. STAT. § 24-31-101(1)(i)(II) |
| Florida | FLORIDA STATUTES, Chapter 501, Part II |
| Illinois | 815 ILL. COMP. STAT. § 505/7(a) |
| Iowa | IOWA CODE §§ 714.16 (7) and (11) |
| Nebraska | NEB. REV. STAT. §§ 87-303.05, 303.11 |
| Oklahoma | OKLA. STAT. TIT. 15, § 756.1 |
| Utah | UTAH CODE § 13-11a-4(1)(a)(i) |

21. The Plaintiff States also bring this action to enforce the consumer protections contained in ROSCA, which are described below.

**DEFENDANTS**

22. Defendant Toast, Inc. is a Delaware corporation with its principal place of business at 333 Summer Street, Boston, Massachusetts 02210. Toast, Inc. transacts or has transacted business in this District and throughout the United States. Toast has office locations in 8 countries, and 5 cities within the United States, including San Francisco, CA. Toast, Inc.'s subsidiaries include Toast Processing Services, LLC, Stratex HoldCo, LLC, Strategy Execution Partners LLC, and xtraCHEF, LLC. At all times relevant to this Complaint, acting alone or in concert with others, Toast, Inc. has advertised, marketed, distributed, or sold restaurant management software and hardware, payment facilitating services, payroll processing and tax filing services, embedded finance, and other related services to consumers throughout the United

States.

23. Toast Processing Services, LLC ("Toast Processing Services") is a Delaware limited liability company with its principal place of business at 333 Summer Street, Boston, Massachusetts 02210. Toast Processing Services transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Toast Processing Services has collected payroll funds from Toast payroll customers throughout the United States and paid such funds out to customers' employees and has collected taxes owed by these Toast customers and paid them out to revenue authorities.

24. Stratex HoldCo, LLC ("Stratex") is a Delaware limited liability company with its principal place of business at 333 Summer Street, Boston, Massachusetts 02210. Stratex transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Stratex has advertised, marketed, distributed, or sold human resources and payroll processing services to Toast customers throughout the United States.

25. Strategy Execution Partners LLC ("Strategy Execution Partners") is a Delaware limited liability company with its principal place of business at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803. Strategy Execution Partners transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Strategy Execution Partners has collected payroll funds from Toast payroll customers and paid such funds out to customers' employees and has collected taxes owed by these Toast customers and paid them out to revenue authorities, for Toast customers throughout the state of Virginia.

26. xtraCHEF, LLC ("XtraChef") is a Delaware limited liability company with its principal place of business at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803. XtraChef transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, XtraChef has advertised, marketed, distributed, or sold restaurant management software services to Toast customers throughout the United States.

## COMMON ENTERPRISE

27. Toast, Inc., Toast Capital LLC, Toast Processing Services, LLC, Stratex HoldCo, LLC, Strategy Execution Partners LLC, and xtraCHEF, LLC (collectively, "Defendants" or "Toast") have operated as a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of law alleged below. Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, and that commingled funds. Because these Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

28. At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

29. Toast is a restaurant software and fintech company that bills itself as a one-stop-shop for managing nearly every aspect of a restaurant's operations on a single platform. Toast advertises its products and services on its websites and social media sites, as well as via targeted email, other digital marketing campaigns, and outbound sales calls.

30. Toast markets point-of-sale ("POS") restaurant software for taking and managing orders, accepting payments, and other related services such as inventory tracking. The POS software is a cloud-based system that runs on Toast terminals and handheld devices. Toast sells the POS software as an annual or biennial subscription service, for which it bills customers on a monthly basis.

31. On average, Toast customers pay more than [redacted] per month ([redacted] per year) for subscription services. Toast subscriptions auto-renew annually.

32. Overall, Toast customers span 156,000 locations globally. Toast reported total revenues of $6.153 billion in fiscal year ("FY") 2025, $4.960 billion in FY 2024 and $3.865 billion in FY 2023. Approximately 82% ($5.037 billion in FY 2025) of Toast's total revenue has

been attributable to financial services, including payment processing services and loans; approximately 15% ($936 million in FY 2025) to subscription services, including restaurant POS bundles; and the remaining approximately 3% ($180 million in FY 2025) to hardware sales.

**<u>Toast Makes False "$0" Claims</u>**

33. Toast markets restaurant hardware, such as countertop terminals, server-stand setups, handheld devices, and kitchen displays, all of which utilize Toast's POS software. Toast also acts as a payment processor for customer-restaurants, transmitting debit and credit card authorization requests captured through the Toast POS system through the applicable card network to the card-issuing bank to approve or decline. Toast charges restaurants for its credit and debit card payment services on a per-transaction basis.

34. Toast advertises various features and plans bundling POS software, hardware, and payment-processing services, including ones where small business customers pay fees per transaction for payments processed through Toast's products, while getting hardware for "$0" and software for "$0/month."

35. For example, Toast advertises "Starter Kits" for "$0/month" as "Ideal for single-location restaurants who need 1-2 terminals to get up and running." See Exhibit 1, below:




**Ex. 1**

36. If the customer clicks, "Shop Now" under the Starter Kit plan, Toast represents on the next screen, Exhibit 2 below, that they will pay "$0 to own" the kit. The screen states that the kit includes a Toast Flex POS terminal and other hardware, as well as POS software.




**Ex. 2**

37. On the next screen, Exhibit 3 below, Toast advertises various subscription packages for this kit, and shows pricing options for what it calls "Pay-as-you-Go Pricing" options by default, listing different payment processing rates depending on the features selected. Regardless of the feature package chosen, the screen continues listing $0 as the price for the Countertop Starter Kit, which includes Toast's hardware and software, and "$0/mo" as the monthly software fee for POS software.




**Ex. 3**

38. Toast next prompts consumers to either stick with "Pay-as-you-Go" or switch to a Traditional pricing plan. The Pay-as-you-Go plan is again selected by default and adorned with the word "POPULAR" in yellow highlighting. This box, depicted in Exhibit 4 below, states, "Card transaction fee covers most costs. Additional cost for some customizations. **Not a lease** – you own the hardware." Customization costs that are not covered by card transaction fees include additional subscription services such as payroll processing or guest self-service ordering. And again, the price of the Starter Kit under this plan is listed as $0, and $0/mo remains listed as the monthly software fee.




**Ex. 4**

39. Customers who toggle over to "Traditional Pricing" to compare plans would see upwards of $1,000 listed as the price for the Countertop Starter Kit, around $69/month listed as the monthly software fee, but would see a lower card transaction fee since these consumers are paying separately for their hardware and software. This means consumers see a choice between paying $0 for hardware and software but higher card transaction fees under the Pay-as-you-Go plan versus paying for hardware and software but lower card transaction fees under the Traditional plan.

40. If the consumer then clicks "Continue to Summary," they will see an "Order Summary" page and then will click "Continue to checkout." A scroll-box will appear next, requiring the consumer to scroll down several times through a series of fine print disclosures and click two checkboxes, before clicking "Continue to Checkout" again.




*[scroll down]*




**Exs. 5 & 6**

41. The consumer next proceeds to the checkout page where they enter their shipping information, hit the "Continue" button, then enter their account setup, and payment information and finalize their purchase. Once the consumer inputs all of their information, they click a button labeled "Complete Your Order," and the system activates the consumer's subscription.




**Ex. 7**

42. As discussed below, when customers encounter problems with Toast's hardware and other products and services, and are unable to get help from customer support, they try to cancel their Toast accounts. At this point, customers learn that Toast products are not $0, even if they chose the Starter Kit and "Pay-as-you-Go" pricing.

43. In fact, in addition to paying higher card transaction fees than those in the "Traditional" plans, customers in the "Pay-as-you-Go" plan also pay for Toast's POS products. First, customers have to pay the full retail value of the hardware, often costing thousands of dollars, if they do not start processing payments within 120 days of purchasing their subscription—a fact that only appears in a gray, fine-print disclosure scroll box which appears towards the end of the enrollment process (see Exhibits 5 and 6 above). Second, if these restaurants ever have temporary closings they have to pay $85/month. This fee is only disclosed on the final checkout screen at the very bottom of the page, in tiny font hidden 8 lines in amongst a block of other tiny text disclosures.




**Ex. 8**

44. Additionally, even after the initial 120-day period, if customers choose to cancel their subscription, they are required to pay an ETF of $150 per month for each remaining month of their contract, no matter how long they've been processing payments with Toast at the higher rate ostensibly to cover hardware and subscription costs. This material term is not disclosed even in the gray, fine-print disclosure scroll box, nor is it disclosed in the mass block of disclosures on the final checkout screen.

45. Instead, consumers would have to click on the "Merchant Agreement" hyperlink in the scroll box (Exhibits 5 and 6 above) and read through to page 12 out of 25 to discover the existence and amount of the ETF.

46. Toast also sometimes includes footnotes and small-print disclaimers in ads, but even if a consumer saw this fine print, it does not reveal the truth or contradicts more prominent information. For example, as depicted in Paragraph 35 (Exhibit 1 above), Toast advertises Starter Kits as "Ideal for single-location restaurants who need 1-2 terminals to get up and running." At the very bottom of that webpage, around six scrolls down, a tiny print disclosure notes that "Pricing includes first hardware terminal subscription. Additional charges apply for subsequent devices." Thus, the disclosure continues to misrepresent that consumers can get the first device for the prominently advertised $0, and otherwise contradicts the more prominent

claims that the $0 applies to "1-2 terminals" restaurants need "to get up and running" by instead indicating that pricing includes only "first hardware terminal subscription."

**Toast Makes False Promises of Around-the-Clock Customer Support**

47. Many consumers who contract with Toast are small business owners who, operating with limited staff, constrained resources, and minimal margins, depend on reliable point-of-sale systems and responsive support to keep their businesses functioning. Toast specifically targets these small businesses with assurances that its platform will provide continuous operational support they critically need but repeatedly fails to deliver on those promises.

48. Specifically, Toast promises restaurants that subscribe to Toast's services that they will be able to get help from Toast customer support 24 hours a day, 7 days a week. For example, Toast's website advertises "24/7 support," boasting that you'll be able to connect with "Real people with real solutions, here when you need them."




**Ex. 9**

49. Another page on Toast's website promises "24/7 Support" alongside the claim that customers can "Connect with real people who really get restaurants, 24/7."




**Ex. 10**

50. In fact, nearly every page of Toast's website highlights a variation of this claim. On a page dedicated to the features of a Toast restaurant POS system, "Access to 24/7 support, 365 days a year," is listed as the second-from-top selling point. On a page tailored to prospective consumers opening new restaurants, Toast touts, "Easy setup and 24/7 support…Need help? We're here for you 24/7." Meanwhile, a page dedicated to currently operating restaurants considering switching their POS systems to Toast offers "Top Tier Reliability" because "24/7 support is there for you every shift," and further down the page claims, "24/7 support – you work industry hours, and so do we." On the Toast webpage advertising Toast payment facilitating services, Toast boasts, "Customer Care available 365/24/7 to troubleshoot any issue in your restaurant, whether it relates to processing or your restaurant POS software." And during the subscription enrollment process, Toast lists "24/7/365 support" as a feature included in each Toast subscription package listed for consumers to choose between. (See Exhibit 3 above.)

51. More than six hundred thousand unique visitors to Toast's website have viewed Toast's 24/7 customer support claim.

52. Consumers believe 24/7 customer service means what it says and, as discussed below, have complained when Toast is unavailable or unable to resolve even basic issues. For example, one customer complained that she signed up after seeing the 24/7 customer support claim, but then her system never worked properly. Another said "we are asking [T]oast to stop advertising they have 24 hour customer support as the customer support they have in place is so painful to deal with that customers are forced to figure things out on their own, such as getting Toast's systems to work."

53. Toast knew its promises of "customer support" were material to consumers. For example, when Toast asked customers in 2025 for their impression of the most important attributes of "customer support," customers identified [redacted] as the top two. And in 2021, Toast conducted several surveys asking restaurants about the attributes that were the most important in their POS purchase decision. The surveys found that the majority of respondents ranked "Service and Support" [redacted]. But the survey results also showed that respondents believed Toast's

competitors [redacted]

54. In 2022, Toast conducted market strategy research showing that, [redacted] The report based on that research recommended that Toast [redacted]

55. Then, in July 2024, Toast surveyed small to medium restaurants in the broader market—not specifically their customers—and found that [redacted] of respondents who were aware of Toast believed Toast would "offer[] high quality customer support" and that [redacted] of respondents who indicated they were "extremely likely or somewhat likely" to purchase Toast ranked [redacted] as one [redacted].

56. Unbeknownst to these consumers in the market, however, Toast customers do *not* actually receive the promised customer "support," nor can customers actually get help or assistance "24/7." In fact, Toast customers report having difficulty reaching anyone who can provide support or answer their questions at *any* time of day.

57. Consumers regularly report contacting Toast customer support and either receiving no response at all, or only being able to reach representatives who cannot or will not provide support. One customer said she signed up with Toast because she "liked the 24/7 customer service and how the system was designed," but that after installation her system never worked properly and she spent several weeks trying to contact Toast, each time receiving either "no response or same excuse." Another customer complained to Toast in 2023, "I was sold great customer service when I committed to Toast in 2019, but was left high and dry. Bad taste still hasn't gone away." Another customer noted that Toast claims to "provide unlimited customer service and support to our business" but that "Toast no longer provides anything close to adequate customer support. The customer support reps are completely unqualified and can not [*sic*] assist with simple problems…We are asking toast to stop advertising they have 24 hour customer support as the customer support they have in place is so painful to deal with that customers are forced to figure things out on their own." Another consumer reported that when

he called customer support on a Saturday with an urgent issue, he was told that the only team that could help him was closed on the weekends, costing him thousands of dollars in credit card transactions.

58. Other consumers have also complained about the inability to reach anyone at Toast who can provide even a minimal level of support:

- "Customer service does not exist, no one can deal with any problem, no one even has the basic knowledge of general business practice!"
- "Toasts system failed at launch, with $0 pricing, broken menus, and a non-functional third-party sync. I spent weeks reporting these issues and was met with delay, deflection, and no resolution."
- "The staff at toast do not answer phone calls or provide any type of customer service."
- "On 3 to 5 separate occasions over the last 4 to 6 months, I have been assigned a 'Case' number by their support team, with promises of follow-up and resolution. To date, not a single one of these cases has been acted upon, and no resolution has been provided. This demonstrates a complete breakdown in their internal complaint handling and customer service processes."
- "Toast is the administrator of my payroll. I've made numerous attempts to contact them regarding deductions from my bank account and tax information not being filed appropriately. There has been no follow-up or response. I contacted my rep, [name] last week asking if we can please get someone on the phone, no luck…Getting through to anyone who can explain or help has been unsuccessful."
- "Been trying for 6 weeks to replace a new POS system. I only get the call center with promises it has been escalated to no avail…I have spent over 10 hrs on the phone trying to correct to no avail!!!"
- "6 phone calls to different agents, all have escalated the issue, nothing is resolved."
- "I have called them atleast [*sic*] 50 times to resolve this and each time i [*sic*] talk to them they tell me its [*sic*] in process and will be solved in 2 weeks time frame. I have

spoke[n] to numerous supervisors and each one of them promises to get back to me on the status but no [one] has ever called back."

- "Toast customer service is not helpful at all…I have been on the phone every day trying to get this resolved. Every time you call they open a new 'case' which makes getting any resolution to problems very difficult. We have gotten no resolution after all of this time and have gotten the run around as to what was needed from us."
- "Our problem is that we cannot get adequate support to set up the systems. Many questions via email go unanswered, telephone calls are answered by voicemail, and appointments for help take up to a week to be scheduled…Asked to talk to a supervisor's supervisor a week ago and have not been contacted. Have been told this is a busy time of year and that they do not have the bandwidth to provide support."
- "The lack of customer service and competency has made it extremely difficult. Two weeks of calling customer care, sales rep, regional manager, integration team, third party vendors, and supervisors with Toast, there is no solution. Horrible horrible horrible merchant support. An easy ask and something Toast sold our business on has yet to work costing us thousands."

59. Similarly, Toast customers complain that Toast representatives mark their cases as "closed" or "resolved" when they have not actually received any answers or assistance:

- "I have opened FIVE cases with them to get this matter resolved and they kept closing the cases and marking them as resolved when it still hasn't been resolved."
- "I have to constantly call to open a case because the cases keep getting closed without a resolution and there is no communication with clear process and timeline for how the situation is being handled."
- "I have contacted toast on 6 different occasions and they close my case out without getting resolved."
- "I have contacted Toast multiple times, but customer service either closed my cases without investigating or stopped responding altogether."
- "Toast has moved the majority of customer support to an inadequate, third party

company. The IBEX offsite team continuously closes cases without offering any resolution…I am currently experiencing a major issue with the firing time of deliveries that is causing hundreds of dollars of loss a day for my restaurant, the phone teams and salesforce IBEX teams are not able to resolve and continue to close cases without offering a resolution."

60. Toast insiders have known for years that its assurance of "24/7/365 customer support" is not true, yet the company continued pushing it as a selling point. In 2022, Toast conducted a survey of all its customers, including those who had never contacted support. Even when including those who had never contacted support, [redacted] with customers writing in responses such as "Toast support is now almost non-existent" and "Customer support is atrocious." Importantly, Toast did not try to determine which of the customers surveyed had contacted support to see what the percentage would be if only such customers were included in the denominator.

61. For years, Toast customers have been reporting consistent reasons for their dissatisfaction with Toast customer care, including that support agents cannot actually provide any support and mark tickets as resolved despite not solving the customers' issues.

62. [redacted], with Toast customers telling Toast, [redacted]

63. An internal Toast research document from February 2024 highlighted that, [redacted] Nevertheless, months later in December 2024, Toast continued to direct its sales representatives to actively promote the purported benefits of Toast's customer support to prospective clients when selling Toast POS systems, despite internal acknowledgment that, [redacted]

64. Additionally, in March 2025, Toast interviewed customers who had cancelled and found a [redacted] Even more recently, a Toast survey report from 2025 stated that, [redacted]

65. Toast knows that its customer support agents lack the expertise and resources necessary for handling customer issues. For example, an internal document from April 2025 [redacted] Finally, in June 2025, an internal memo recommended [redacted]

66. And, despite advertising that Toast customer support is "24/7," certain support teams are not available at all during many hours of the day or even certain weeks of the year. For example, the subscription cancellation team and the Toast Capital care team both only accept calls during limited business hours, and the Toast tax team has "blackout" periods each quarter where they will not respond to customers *at all*. This leads to extensive customer-support backlogs and serious consequences for Toast customers. For example, one Toast employee

messaged his colleagues about a customer experiencing issues with the tax support team: "I have a cx that is asking to speak to a rep and they sent her an email and closed it they didn't even wait for the cx to respond." Other Toast employees responded, noting, "You can start a case for them and ask them to reach out…but in all honestly, even if you escalate it with the Tax team, I wouldn't expect an email to even be sent out prior to mid week at the absolute earliest." And that "I've got a customer that's been waiting almost the entire month of July because they won't even address it until their Blackout is over." Similarly, a Toast employee wrote on March 15, 2023, that "A tax case (listed above) has been sent to tax on Feb 24th. The customer is calling concerned that if her taxes she received the notice on (which is on the case) isn't handled soon besides penalties she may not be able to get her liquor license and cause interruption to her business if this isn't resolved soon." On the same conversation thread another employee lamented that because Toast did not file taxes timely for a customer, and was not responding to their inquiries, the state had a hearing regarding revoking the restaurant's certificate of registration.

67. Toast nonetheless has continued touting "24/7/365 customer support" prominently across its website and enrollment flows through the present day.

**<u>Toast Has Deceived Restaurants About Fees that It Also Hid from Patrons</u>**

68. When restaurants enroll in Toast subscription plans, Toast represents that the restaurants will pay per-transaction fees for payments processed through Toast's products, and in some pricing models, fees for Toast's products. None of the pricing models presented to the restaurants during enrollment, and listed in their contract with Toast, reveal that Toast might also charge fees directly to restaurants' patrons.

69. However, beginning at certain locations in or around September 2021 and launching to all Toast customer-restaurants by at least June 2023, Toast unilaterally charged restaurant patrons a $0.99 fee on every online order greater than $10 placed through Toast's digital ordering channels. None of the money collected from this fee went to the restaurant itself; it was all funneled directly to Toast. This fee was on top of the amount these restaurants were already paying Toast for the online ordering services subscription add-on and the amount

they were paying Toast per transaction for payment processing services.

70. When restaurant patrons went to place an online order, the fee did not show up as a new line item but was instead added within a pre-existing line labeled "Taxes & Fees." Unless the restaurant patron noticed and clicked a small tooltip icon next to the words "taxes and fees," they would not know they were being charged a new hidden fee but would be left wondering why their order from this restaurant was more expensive than usual. If the restaurant patron did notice and click the icon, the following pop-up box appeared.




**Ex. 11**

71. Even if patrons clicked and saw this language, they would see that the $0.99 "Order Processing Fee" was "Set by Toast to help provide affordable digital ordering services *for local restaurants*" (emphasis added). Nowhere did Toast state that it, not local restaurants, would keep the fee. Instead, Toast used language obscuring that it was the primary or sole beneficiary of the fee.

72. Prior to institution of the new fee, Toast sent its customer-restaurants notifications, such as the one in Exhibit 12 below, that they were automatically "being upgraded to the next generation of digital ordering" and prominently highlighting new features such as the fact that restaurants would now be able to customize "fonts, colors, and images":




**Ex. 12**

73. Only if the restaurant did not hit the X to close out of this first screen, and instead hit "Next," and scrolled down to the last bullet in the middle of the second screen, would they see any mention of the fee. Even if they noticed it, Toast did not allow restaurants to opt out of the fee or control how it was disclosed to patrons.

74. The practice of charging hidden fees does not provide any benefit to consumers or competition. There is no benefit to restaurants who already agreed to a different pricing plan in their contract with Toast and who already pay Toast for both payment processing services and online ordering services. In fact, restaurants expressed confusion, surprise, and anger when learning of the fee:

- "Toast instituted a charge to my customers within our online ordering system that Toast software ran without our permission. This fee went directly to Toast. They basically were charging my customers a fee to use the system that I was already paying them to use."
- "Toast POS has started charging [my] customers directly $.99 per online order

starting today. . . .It is the definition of a junk fee!!...This fee is completely absurd and not in the contracts we signed with Toast."

- "Toast also operates as the credit card processors for our restaurants at the cost of 2-3.50% of each transaction. The POS system was sold as a package with on-line ordering being a key component of the system. Last week, without our knowledge or consent, Toast began charging our customers a flat fee of $0.99 for every on-line order placed in the amount greater than $10. This flat fee is rolled into the total tax amount and is listed on our guest's receipt as 'taxes and fees'. A customer would have to hover over the line item for a detailed description of the fee…This was not disclosed when we decided to use Toast as our POS."
- "Toast has started adding a 99 [cent] 'Order Processing Fee' to all orders over $10, which is not controllable by the business and is not in their original contract language, applied directly to consumers. This fee is hidden in a 'taxes and fees' section of the order preview which you have to expand to see that it's applied directly by Toast. Because this is the direct way to order through a restaurant (vs a service like Uber where you expect fees) fees aren't expected, and there's no way to avoid it."
- "Toast is a credit card processor and a point of sale system for restaurants. Recently they have implemented a fee of $.99 on online orders that total more than $10.00. This fee is being charged directly to the restaurants customer not the restaurant and the restaurant can not opt out. This is no different than an employee ringing up a customer at a cash register, seeing that the total is $10.00, telling the customer the total is $11.00, putting [*sic*] $10.00 in the cash drawer and putting $1.00 in their pocket…They should not have the right to upcharge my pricing without my consent and put that money directly in their bank."
- "We recently were made aware of the additional online ordering fee that will be applied to online orders over $10…We did not consent to the proposed automatic deduction of any fees for online services from our funding other than as agreed to in our contract for the Growth Package which includes a set monthly subscription price

for online ordering services. We want to continue providing online services under the contract terms that were agreed to."

- "This week, Toast made the unilateral decision to institute a .99 processing fee on all online orders. Restaurants have no control over this fee or how it appears on the guest check, and it's being routed directly to Toast. It feels like an extreme overreach on Toast's part. It inhibits the restaurant's ability to choose how to interact with the guest, it appears as if the fee is imposed/collected by the restaurant, and it limits the restaurant's ability to implement any fee moving forward. It also makes the guest check look ridiculous. How many fees & service charges will the customer accept before they choose to pass all together? It's infuriating that, as an owner, I can't control this part of the guest interaction."
- "Toast has instituted a $0.99 charge to customers for all online orders over $10. Owners cannot opt out of this charge and Toast stands to raise untold revenue from this unscrupulous device…We as owners were not consulted and our businesses will be adversely affected by this action."

75. Toast knew before mandating the fee across its customer base that the fee was unpopular with both restaurants and restaurant patrons alike, but rather than abandoning the fee or otherwise addressing customers' concerns with it, Toast chose to obscure the fee instead. Toast tested the fee across 14 various markets between Q3 2021 and Q1 2023 and used these tests to shape its strategy for the full launch. In late 2021 Toast originally listed the fee in a separate line item for "service charges" and when customers hovered over the tooltip, the disclosure clarified that it was a "Toast Online Ordering Fee" and that the fee was used by Toast to "help[] us operate our platform":




**Ex. 13**

76. Throughout 2022, Toast received backlash from restaurants about the "service fee." For example, one restaurant said, "Stop charging my guests a service fee effective IMMEDIATELY and refund the service fees you charged to my guests cards. ThIs [sic] is unacceptable! I never approved this." Another small business owner wrote in concerned he would lose customers over the fee, "We pay for online ordering every month in addition to very high cc processing rates. There is no reason our guests should be charged separately…We have already had some complaints by our customers I really hope this doesn't affect our business. We can't afford it…There is no way a small Bagel Shop like us can raise an item a $1 then also have our customer pay an additional .99 service charge. This will definitely make them choose somewhere else."

77. By 2023, Toast made the decision to start calling the fee an "order processing fee," and to further hide it, this time within a line item for "taxes and fees." The tooltip disclosure box was also shortened, making it harder to determine whether Toast or the restaurant would be using the fee (see Exhibit 11 above). In May 2023, Toast created an internal document to track common concerns of restaurants complaining about the fee. One of the top concerns of restaurants was that Toast needs to "[d]isclose that the order processing fee is coming from Toast. Right now it is hidden behind the question mark," and that customers want "it to be clear that Toast is charging this fee and not the restaurant." An example customer complaint was

listed: "To put this fee in 'taxes and fees' is not how many operators communicate with guests." Toast chose to move forward with the full launch of the fee in June 2023 without further changes. Unsurprisingly, restaurants broadly continued to have the same concerns after the launch, with one restaurant complaining to Toast, "Customers think WE have added the fee. This is deceptive and a huge money grab for toast and puts restaurants in the position of having to explain YOUR fee that we had no voice in implementing…Even the naming of it 'Order Processing Fee' was purposefully vague so that customers would think it comes from the restaurant. Shame on you. If you are going to access [*sic*] a mandatory fee, own it! Call it Toast Systems Ordering Fee or SOMETHING that makes it perfectly clear that this is you, not us."

78. Toast's collection of fees materially affected how consumers viewed restaurants and their employees. Internal Toast research presentations from 2023 and 2024 found that the [redacted] The absence of hidden fees ranked [redacted] Further, the 2024 research presentation showed that [redacted] of restaurant patrons indicated that they would not leave a tip if their order had added fees applied.

79. The 2024 research presentation explained that [redacted]

80. The only party who benefitted from the imposition of the fee was Toast, which earned [redacted] from the fee. Toast rolled this particular fee back in late-July 2023 in response to widespread criticism from customer-restaurants and from industry experts, but has yet to refund any of the proceeds from the fee to consumers and has continued to charge other hidden and unauthorized fees, as discussed below (see, *e.g.*, Paragraphs 86, 96, and 102–105).

**<u>Toast Online Subscription Enrollment and Unauthorized Charges</u>**

81. To use Toast POS products and services, restaurants must enroll in subscriptions, under which Toast bills them on a monthly basis. Toast subscriptions start at about $90 per location per month, and increase depending on the number of terminals used and the number of

add-on services bundled into their subscriptions. Examples of Toast add-on subscription services include Toast Kiosk, for guest self-service ordering ($100/device/month), and Toast Kitchen Display Systems, to replace printed kitchen tickets ($35/device/month). Toast customers can also bundle payroll services into their subscription, such as employee timekeeping, payroll processing, and filing of federal, state, and local payroll taxes. On average, Toast customers pay around [redacted] per month for subscription services.

82. The enrollment process for small-to-medium business consumers typically starts online when a consumer visits the Toast website. Once there, consumers can sign up through an online self-service flow, such as the one depicted in Paragraphs 35 through 41 above.

83. Alternatively, consumers may initiate enrollment by inputting their information into a web inquiry form and clicking the "Get a Demo" button to schedule a demo with a Toast sales representative. After working with a sales representative and getting a quote, these customers will receive an online order form and a Toast "Merchant Application" via DocuSign, an internet application, for electronic signature. The order form requires the consumer to fill in their bank name, account number, and routing number and attach a picture of a voided check. The consumer's electronic execution of the order form and Merchant Application—completed online—enrolls the consumer into a Toast subscription.

84. Around January 2025, Toast introduced another online enrollment process called "Quote Builder," in which Toast online sales representatives send a link to the consumer to complete checkout. The shipping, account setup and payment webpages are the same as in the online self-service path above, after which the consumer is shown an order confirmation page.

85. Regardless of the enrollment method, the consumer must either checkout online or must execute order forms online via DocuSign, triggering subscription enrollment. Customers also must always provide their bank account information, tax identification number, Social Security number, and a photo of a government-issued ID during enrollment. If Toast subsequently charges consumers for new add-on subscriptions, Toast automatically uses the bank account information already on file.




**Ex. 14**

86. Toast customers frequently complain that they have been enrolled in and charged for Toast subscription add-ons without their consent. For example, one customer complained to Toast that they "explicitly did not opt-in to these services when they were first introduced. These services were never to be activated in the first place, yet we have been billed for them for an extended period, leading to significant overcharges that need rectification." Another customer facing similar issues wrote, "Very difficult to communicate with Toast staff. We're still waiting for refunds from Toast for subscriptions we didn't ask for, nor want." In fact, an internal Toast report from 2023 noted that, [redacted] Toast uses the term "downsell" to refer to customers cancelling one or more of their subscription add-ons, and the word "churn" to refer to customers cancelling their entire subscription account with Toast.

87. Unauthorized billing is an issue that is frequently discussed amongst Toast employees. For example, in April 2023, one employee sent a chat that said, "Oh what, no way, another billing error? That's so out of the ordinary." Another employee responded, "can't believe it" and said they were being "sarcastic."

88. Similarly, in March 2024, one employee explained, "One thing I hear a lot is customers saying that the process to see any sort of credit applied to their account after they inform us of an issue takes a long time – months not days or weeks. They may have discovered that they are paying for Email Marketing – tell us that they don't use it and they shouldn't be paying for it – request to turn it off, and then we keep billing them for Email Marketing for months."

**Toast Makes it Difficult For Customers to Cancel Subscription Services**

89. Toast subscriptions automatically renew for successive one- or two-year periods until the consumer cancels. However, Toast has instituted a cancellation process that is non-intuitive, time-consuming, far from simple, and requires the involvement and cooperation of multiple teams within Toast. The convoluted, multi-step cancellation process instituted by Toast, combined with Toast's customer support failures, prevents or makes it hard for consumers to cancel their subscriptions, saddling consumers with additional months or even years of unwanted charges.

90. Despite the fact that consumers can enroll in Toast subscriptions online, Toast customers cannot similarly cancel their subscriptions online. To initiate cancellation, the customer must provide written notice at least 30 days prior to the end of their subscription term of their "intent not to renew." The requirement for written notice, and the 30-day deadline, are not clearly disclosed during the enrollment flow. Consumers would only know about these requirements if they clicked the hyperlinked Merchant Agreement link (see Exhibit 6 above)—which consumers aren't required to open during sign up—and then scrolled through to page 11 out of 25 of the Agreement and specifically read the dense 17-line paragraph of text in Section 8.1 to parse out the confusingly worded cancellation requirement on the eleventh line in the middle of the paragraph.

91. Even when customers provide the required written notice within the indicated time strictures, their subscriptions are not cancelled. Some consumers report that after they provide their written intent to cancel, they never hear back and continue to be charged. For example, one consumer complained, "I emailed [representative name] at [representative email]

on October 18, 2024, stating that I wanted to cancel…On November 8, I received a notice from Toast that the subscription would automatically be billed on November 16. I responded to the email and copied [representative name], and once again stated that I wanted to cancel the accounts. I received no response."

92. Customers who are fortunate enough to receive a response to their written intent to cancel are told to either call "Customer Care" or contact Toast via a live chat function. Some consumers report that at this point they cannot reach a representative that can help them with cancellation. For example, one consumer lamented, "I have submitted requests through their chat service, I have been instructed to call back, I have waited for over two hours to be connected with a supervisor and there is no supervisor available and my account is still live and I'm still being billed on autopay for a service I have not used in many weeks. No one has an answer. There is not a 'supervisor' to approve the cancelation, there is no one to email or talk to other than a representative who apologizes profusely and tries again to find someone to help me."

93. Customers who are able to reach a customer care representative next are subjected to questions about why they want to cancel and must resist sales pitches intended to keep them from cancelling. Indeed, internal scripts instruct customer care representatives to ask "probing questions" and attempt to "de-escalate the situation." Even if this is unsuccessful, Toast does not permit customers to cancel via the main customer care line they were instructed to call after submitting their intent to cancel (and who have been attempting to talk them out of cancelling). Rather, customers attempting to cancel must be transferred to a special cancellation telephone line, internally referred to as the "churn line," which is not publicly available—meaning customers always must speak with a customer care representative first and then speak with a cancellation agent—and which operates on a more restricted time schedule. Even though Toast prominently advertises "24/7 customer care," the churn line is only available on weekdays between 9am and 5pm ET. If the customer is trying to cancel outside of those hours, they are told to await a callback during business hours. Numerous customers report never receiving the requested callback.

94. Once connected to the "churn line," the churn line representative will either email

the customer an "Account Deactivation form" or will instruct the customer to find the form on Toast Central—a Toast customer support website. Customers are then forced to stay on the line while they fill out the form—a process representatives are instructed to tell customers should take around 15 minutes—rather than being allowed to fill out the form on their own time. If they can't stay on the phone for the full 15 minutes, they aren't allowed to proceed with cancellation.

95. After the customer completes and submits this form, they *still* have not cancelled. Next, another internal Toast team, called the "Account Operations" team, has to review the Account Deactivation Form and process the cancellation within Salesforce, Toast's internal customer relations system. The cancellation does not become effective until the date the Deactivation Form is processed in Salesforce. However, consumers report that rather than processing this form upon receipt, Toast representatives use this step as another roadblock to cancellation. Some consumers report being forced to schedule meetings with a "cancellation specialist" before their cancellation will be processed. As one consumer explained: "I've moved on and swithched [*sic*] to a different Point of Sale system (POS). In order to cancel and close my account with Toast they are requiring me to schedule a 30 minute over the phone conversation with both of the owners to go through why we chose to cancel our product. Our monthly invoice renews on 7/25 and the first meeting we can get is 7/29. Also it just seems like a misleading practice that we can't simpl[y] cancel our contract with a signing of docusign like we used to add new products, but in order to cancel I have to wait a week and schedule a 30 minute conversation with a cancellation specialist."

96. Other consumers report that Toast representatives delay processing or simply never process their deactivation forms and continue charging them monthly for subscription services they no longer use. For example, one consumer reported submitting his Account Deactivation Form the same day he was instructed to, and being reassured by a Toast representative that he would not be charged again, but, in fact, being charged two more times before he could get in contact with another Toast representative who was able to process the cancellation but never refunded the extra charges. Additionally, in numerous instances when customers do manage to navigate Toast's convoluted process and ostensibly complete the

required cancellation procedures, Toast continues to bill them for recurring service fees anyway. For example, a Toast employee trying to help a customer in 2023 noted, “This customer churned both of their locations, but continued to get charged. We need to refund them back in full.” Toast is aware of this issue, as employees regularly raise this concern internally:

- “Downsell was not submitted by agent that initially worked with Cx, further delaying the downsell and frustrating the Cx.”
- “If the customer has the inventory subscription on their account, but they’ve requested multiple times to have it removed since 12/2019 to have it removed and they are still paying for it, how far back can we go to reimburse them for that? I feel like 3+ years worth of credit would be tough to approve…They used it for like a week when they first signed up, then never again.”
- “Cx had several cases revolving around failed downsells and passed around for some time without a real resolution.”

97. For Toast customers who are also enrolled in payroll subscriptions, the cancellation process does not end there. On top of navigating the general subscription cancellation process described above, they then have to navigate a second cancellation process to cancel their payroll subscription. These customers must provide written notice of their intent not to renew their payroll subscription by emailing payrollsupport@toasttab.com at least ninety days prior to the end of their current payroll subscription term. Next, the Toast Payroll Care Team must create a case in Salesforce. Finally, the Account Operations Team must send the customer a copy of the “Payroll Deactivation Form” via email for the customer to complete (on top of the Account Deactivation Form separately submitted).

98. Upon receipt of a completed Payroll Deactivation form, Toast “Customer Care Associates” are supposed to finally deactivate payroll services in the Toast Payroll System. But, as with core subscription cancellations, this does not always happen. As one consumer explained to the FTC, “Before ever going live I cancelled and went with [competitor]. Randomly in May 2024 Toast Payroll started charging me. Somehow the sales person didn’t completely close out the account so they say…I have multiple case numbers with them and every time I speak with a

payroll specialist they say it's been escalated and they unfortunately can't transfer me as it's internal. This has been going on for almost a year now with no resolve. They are illegally withdrawing money from my account each month with nothing I can do about it." Another customer complained to Toast, "I have been a Toast customer since July 2020 and have regretted the decision ever since. Your customer service is the worst I have ever dealt with personally or professionally. My most recent issue I have had to address with your company is attempting, and failing, to cancel my payroll services with you. I originally initiated the cancellation process over one month ago, filled out and sent back the required paperwork and have yet to hear from anyone over three weeks later after multiple attempts via email and phone have been made to get some semblance of an answer from anyone in your god awful company."

99. Consumers frequently report difficulty getting any support, or even communication, from Toast in navigating this multi-step cancellation process. For example, one customer who was attempting to cancel some of their services in 2023 told Toast, "It literally went back and forth for 65 days emailing if not longer, and trying to get to the right person who can cancel some of that stuff. And I didn't want xtraCHEF [an add-on subscription service for invoice tracking and other data analytics] canceled. That's one of the things that we actually do use is the invoice automation, and that's one of the things that they end up canceling that I didn't want canceled. So I mean it's definitely, that part has not been a good experience."

100. Another consumer complained to the FTC, "I tried to cancel our service via the customer success portal and chat, and was told I had to call in to cancel. I called in and spoke to 3 separate people, finally getting confirmation of termination of services. I got an email confirming cancellation. I was then charged for an additional month of service. When I attempted to request a refund, I was told my cancellation was 'not complete' and I would have to call again and speak with a supervisor." A third consumer reported similar communication failures: "I have sent 9 follow up emails [about a cancellation request] with no or very vague responses from other people redirecting me to my [first] contact and have continued to be charged for this service on a monthly basis. I don't know what else to do and I am not hearing anything back from them. I…heard back initially to let me know why I should not cancel and

now am not hearing anything back."

101. Starting in March 2025, Toast began gradually introducing an online "Subscriptions Hub" where a certain segment of Toast customers can initiate a "downsell," *i.e.*, create a request to remove certain add-on product subscriptions from their account. These cancellation requests do not become effective until a member of the internal Toast Account Operations team processes the request within Salesforce. Even customers with access to the Subscriptions Hub cannot process a downsell without approval of the Account Operation team, and no Toast customers can cancel their core Toast subscription (voiding their Merchant Agreement and stopping all recurring charges) with Toast online via any method.

**<u>Toast Employs Surprise, High Fees Which Further Impede Cancellation</u>**

102. In some instances, Toast further impedes subscription cancellation by charging high, unexpected ETFs when customers try to cancel. For example, one consumer complained to the FTC that he was charged a $5,318.87 ETF, which Toast refused to refund, when he cancelled his account after 4 years. Another consumer explained that they cancelled their Toast contract before ever receiving equipment or using any Toast software and received an invoice for $17,030.74 set to auto-draft from their business bank account for the amount of the contract. Other consumers have complained about being charged unexpected ETFs:

- "The [Toast] system failed immediately and caused major operational disruption. We were unable to use it beyond the first day, and Toast did not provide any follow-up support, technician assistance, or a working solution. Because the system did not function, we stopped using Toast entirely after the first day. Six months later, in February 2024, Toast made an unauthorized ACH withdrawal of $4,361.68 from my business bank account without any prior notice, invoice, contract explanation, or authorization."
- "We terminated the contract less than 60 days into the business due to a lack of customer service and resolution to the problems at hand. We were required to pay $4630.09 on 10/14/2024 for the early termination. However, the company continued to bill us $49/month across 3-4 months. They now debited our bank account an

additional $4630.09 on 2/12/2025 for the early termination that was already paid on 10/14/2024."

103. Toast does not reveal ETFs in the enrollment flow. Instead, consumers would have to click on the merchant agreement, which they are not required to do, in the gray, fine-print box depicted in Exhibits 5 and 6 above, scroll through to page 12 of 25, and read Section 8.4, which is not labeled with any header, to discover the existence and amount of the ETF they would be expected to pay upon cancellation.

104. Numerous customers report being surprised and confused to discover Toast's ETFs, complaining that they never saw the ETF policy or that the policy was not explained to them at the point of sale. Toast's ETF policy impedes cancellation, presenting customers with two unappealing options: pay out the rest of the contract and receive no services or pay out the rest of their contract and continue unwanted services.

105. In fact, Toast instructs agents to use the ETFs as a way to convince customers not to cancel. A script given to customer support agents for use when customers are seeking to cancel instructs, [redacted]

106. As explained below, subscription cancellation is even more costly for Toast customers that also have a Toast Capital Loan.

**<u>Toast Uses Loan Terms to Further Impede Subscription Cancellation</u>**

107. In 2019, Toast launched Toast Capital to offer financing to Toast customers, which Toast advertises as superior to traditional bank loans.

108. Unbeknownst to Toast customers, however, Toast Capital Loan holders are forbidden from changing POS providers without Toast Capital's advanced permission (which it may withhold "in its sole discretion"). Otherwise, if the customer cancels or changes its POS provider, Toast treats this as an "Event of Default" on the customer's loan.

109. This restriction, which is not disclosed at any point during the Toast Capital Loan

application process, serves as a roadblock to subscription cancellation, leading consumers to either pay out extra months of subscription charges to avoid defaulting on their loan or to cancel their subscription and be blindsided by unexpected, accelerated loan charges for "defaulting"—*in addition to* any assessed ETFs, as discussed above.

110. At least tens of thousands of consumers have complained about these issues. Further, when examining by state the consumers who have complained to the FTC, consumers from California have the most complaints.

111. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

112. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

113. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

114. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## CLAIMS BROUGHT BY THE FTC PURSUANT TO THE FTC ACT

### Count I

### Misrepresentations About Toast Services

115. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of restaurant management software, hardware, and financing products and services, Defendants represent, directly or indirectly, expressly or by implication, that under certain plans, Toast hardware is $0.

116. In fact, the representations set forth in Paragraph 115 are false, misleading, or not substantiated at the time the representations were made.

117. Therefore, the making of the representations as set forth in Paragraph 115 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**

**Misrepresentations About Customer Support**

118. In numerous instances in connection with the advertising, marketing, offering for sale, or sale of restaurant management software, hardware, and financing products and services, Defendants represent, directly or indirectly, expressly or by implication, that Defendants provide customer support 24/7/365.

119. In truth and in fact, in numerous instances, Defendants' customer support agents are unavailable or lack even basic knowledge about Toast's products and services, much less the ability to provide solutions or support.

120. Therefore, Defendants' representations as described in Paragraph 118 are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count III**

**Unfairly Charging Fees Without Consent**

121. In numerous instances, Defendants have charged consumers for fees for which consumers have not provided express, informed consent.

122. Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

123. Therefore, Defendants' acts or practices as described in Paragraph 121 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

124. In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*, which became effective on December 29, 2010. In passing ROSCA, Congress declared that "[c]onsumer confidence is essential to the growth of online commerce.

To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401.

125. Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller, among other things, provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, obtains the consumer's express informed consent for the charges, and provides simple mechanisms for a consumer to stop recurring charges. *See* 15 U.S.C. § 8403.

126. The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

127. As described in Paragraphs 11, 30, and 81-85 above, Defendants have advertised and sold subscription services through a negative option feature as defined by the TSR. 16 C.F.R. § 310.2(w).

128. Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

## CLAIMS BROUGHT BY ALL PLAINTIFFS PURSUANT TO ROSCA

### <u>Count IV</u>

### Failure to Provide Required Disclosures

129. In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature as described in Paragraphs 11, 30, and 81-85 above, Defendants have failed, before obtaining consumers' billing information, to clearly and conspicuously disclose all material transaction terms, including the following terms:

a. The true cost of Toast's products and services;

b. In an accurate manner, the customer support it markets; and

c. Toast's fees.

130. Defendants' acts or practices, as described in Paragraph 129 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

**Count V**

**Failure to Obtain Express Informed Consent Before Charges**

131. In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature as described in Paragraphs 11, 30, and 81-85 above, Defendants have failed to obtain a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction.

132. Defendants' acts or practices, as described in Paragraph 131 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

**Count VI**

**Failure to Provide Simple Mechanisms for Stopping Recurring Charges**

133. In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature as described in Paragraphs 11, 30, and 81-85, Defendants have failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

134. Defendants' acts or practices, as described in Paragraph 133 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

**STATE LAW CLAIMS BROUGHT BY THE PLAINTIFF STATES**

**Claims Brought by the People of the State of California Pursuant to the State of California's UCL and FAL**

**Count VII**

**Violations of California's FAL, Cal. Business and Professions Code § 17500 *et seq.***
**(False or Misleading Statements)**

135. The People of the State of California re-allege and incorporate herein paragraphs

1 to 134 of this Complaint.

136. Defendants have engaged in business acts or practices as alleged in this Complaint that constitute violations of Business and Professions Code section 17500 *et seq.* by making or disseminating, or causing to be made or disseminated, false or misleading statements with the intent to induce members of the public and businesses in California, including in Los Angeles and San Francisco, to use Defendants' restaurant management software, hardware, and financing products and services, when Defendants knew, or by the exercise of reasonable care should have known, that the statements were false or misleading.

137. Such statements include all the false or misleading statements alleged above, including but not limited to:

a. Under certain plans, Toast hardware is "$0"; and

b. Defendants provide customer support 24/7/365.

138. Defendants made such false and misleading statements and representations, as described in paragraph 137, when, in actuality, the representations are false, misleading, or not substantiated at the time the representations were made as described above: for example, none of Toast's hardware is $0 and, in numerous instances, Defendants' customer support agents are unavailable or lack even basic knowledge about Toast's products and services, much less the ability to provide solutions or support.

139. Each of these misrepresentations and/or omissions described in paragraph 137 was material and likely to deceive a reasonable customer or prospective customer.

140. Based upon Defendants' false and misleading practices alleged above, the People of the State of California are entitled to all appropriate relief under California's False Advertising Law, including injunctive relief, civil penalties, restitution, and such other equitable relief as the court deems just and proper.

## **Count VIII**

### **Violations of California's UCL, Cal. Business and Professions Code § 17200 *et seq.* (Unfair Competition)**

141. The People of the State of California re-allege and incorporate herein paragraphs

1 through 140 of this Complaint.

142. Defendants have engaged, and continue to engage, aided and abetted, and conspired to engage in acts or practices that are unlawful, unfair, or fraudulent, and which constitute unfair competition within the meaning of California Business and Professions Code § 17200. These acts or practices include, but are not limited to, the following:

143. Violations of the False Advertising Law, California Business and Professions Code § 17500, as more fully set forth in Count VII above;

144. Violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), as alleged above in paragraphs 112 through 123; and

145. Violations of Section 4 of ROSCA, 15 U.S.C. § 8403, as alleged above in paragraphs 129 through 134.

146. Defendants have engaged in fraudulent acts, including, but not limited to, making numerous untrue or misleading statements or admissions such as that (i) Defendants will, under certain plans, provide Toast hardware for $0 and (ii) Defendants provide customer support 24/7/365.

147. Defendants have engaged in unfair acts, including, but not limited to: (i) charging consumers for fees for which consumers have not provided express, informed consent; and (ii) failing to obtain a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services.

148. Based upon Defendant's unlawful, unfair, and fraudulent practices alleged above, the People of the State of California are entitled to all appropriate relief under California's Unfair Competition Law including injunctive relief, civil penalties, restitution, and such other equitable relief as the court deems just and proper.

**Claims Brought by the Attorney General of Colorado Philip J. Weiser**

**Count IX**

**Violations of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1)(i) and/or 105(1)(l)**
**(Deceptive Acts or Practices)**

149. The Colorado Attorney General re-alleges and incorporates the preceding

paragraphs as if they are fully alleged herein.

150. Defendants advertised goods, services, or property with the intent not to sell them as advertised. C.R.S. § 6-1-105(1)(i). Specifically, during the time period described in this Complaint, Defendants represented, directly or indirectly, expressly or by implication that under certain plans, Toast hardware is “$0”.

151. Defendants made a false statement of fact concerning the price of its goods and services. C.R.S. § 6-1-105(1)(l). Specifically, during the time period described in this Complaint, Defendants represented, directly or indirectly, expressly or by implication that under certain plans, Toast hardware is “$0”.

152. In fact, these representations are false, misleading, or not substantiated at the time the representations were made.

153. When Defendants performed the deceptive trade practices described in the preceding paragraphs, they did so in the course of their business, vocation, or occupation.

154. The deceptive acts or practices alleged herein constitute separate violations of the Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both separately and as taken together, Defendants violated the Colorado Consumer Protection Act. C.R.S. § 6-1-105(1)(i) & (l).

## <u>Count X</u>

**Violations of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1)(i) and/or 105(1)(e)**
**(Deceptive Acts or Practices)**

155. The Colorado Attorney General re-alleges and incorporates the preceding paragraphs as if they are fully alleged herein.

156. Defendants knowingly and/or recklessly made a false representation as to the characteristics of its services. C.R.S. § 6-1-105(1)(e). Specifically, during the time period described in this Complaint, Defendants represented, directly or indirectly, expressly or by implication that Defendants provide customer support 24/7/365.

157. Defendants advertised goods, services, or property with the intent not to sell them

as advertised. C.R.S. § 6-1-105(1)(i). Specifically, during the time period described in this Complaint, Defendants represented, directly or indirectly, expressly or by implication that Defendants provide customer support 24/7/365, when, in truth and in fact, in numerous instances, Defendants' customer support agents are unavailable or lack even basic knowledge about Toast's products and services, much less the ability to provide solutions or support.

158. In truth and in fact, in numerous instances, Defendants' customer support agents are unavailable or lack even basic knowledge about Toast's products and services, much less the ability to provide solutions or support.

159. When Defendants performed the deceptive trade practices described in the preceding paragraphs, they did so in the course of their business, vocation, or occupation.

160. The deceptive acts or practices alleged herein constitute separate violations of the Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both separately and as taken together, Defendants violated the Colorado Consumer Protection Act. C.R.S. § 6-1-105(1)(e) & (i).

**Claims Brought by the Florida Attorney General Pursuant to the Florida Deceptive and Unfair Trade Practices Act**

**Count XI**
**(Violations of Florida Statutes, Chapter 501, Part II)**

161. The Florida Attorney General adopts, incorporates herein, and re-alleges paragraphs 1 through 111, as if fully set forth hereinafter and further alleges:

162. Section 501.204(1), Florida Statutes states that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

163. At all times material hereto, Defendants engaged in "trade or commerce" as defined in Section 501.203(8), Florida Statutes, by engaging in the business further described in Paragraphs 22-26 above to consumers throughout Florida.

164. Section 501.203(8), Florida Statutes, defines "[t]rade or commerce" as:

> the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

165. As the enforcing authority, the Florida Attorney General "may bring [a]n action to enjoin any person who has violated, is violating, or is otherwise likely to violate, this part." Fla. Stat. § 501.207(1)(b).

166. Under FDUTPA, "'[v]iolation of this part' means any violation of this act or the rules adopted under this act and may be based upon…[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(c)(3).

167. The provisions of FDUTPA shall be "construed liberally" to promote and "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

168. The Defendants have violated FDUTPA when they (a) made misrepresentations, directly or indirectly, expressly or by implication, that under certain plans, Toast hardware is "$0" (as further set forth in Paragraphs 33-46 above) and (b) in connection with the advertising, marketing, offering for sale, or sale of restaurant management software, hardware, and financing products and services, Defendants misrepresent, directly or indirectly, expressly or by implication, that Defendants provide customer support 24/7/365, when in fact, their customer support agents are unavailable or lack even basic knowledge about Toast's products and services, much less the ability to provide solutions or support (as further set forth in Paragraphs 47-67 above).

169. Through the actions and related business practices set forth in this Complaint, the Defendants engaged in representations, acts, practices or omissions that were material, and that

were likely to mislead consumers acting reasonably under the circumstances to the consumer's detriment.

170. Through the actions and related business practices set forth in this Complaint, the Defendants have engaged in acts or practices in trade or commerce that shock the conscience.

171. Through the actions and related business practices set forth in this Complaint, the Defendants have engaged in acts or practices in trade or commerce that offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.

172. Through the actions and related business practices set forth in this Complaint, the Defendants engaged in acts or practices that were likely to cause substantial injury to consumers. This substantial injury was not reasonably avoidable by the consumers themselves and was not outweighed by countervailing benefits to consumers or competition.

173. Thus, the Defendants engaged in unfair or deceptive acts or practices, or unconscionable acts or practices in the conduct of trade or commerce in violation of Section 501.204(1), Florida Statutes.

174. Defendants are subject to civil penalties for willful violations of FDUTPA in the amount of Ten Thousand Dollars ($10,000) for each violation pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000) for each violation that victimized or attempted to victimize a senior citizen pursuant to Section 501.2077, Florida Statutes.

175. Defendants willfully engaged in and could continue to engage in deceptive and unfair acts and practices in that Defendants knew or should have known that the methods, acts, or practices alleged herein were and are unfair, deceptive, unconscionable, and prohibited by law.

176. These above-described acts and practices of Defendants have caused substantial injury to the public and will likely continue to cause injury and prejudice the public.

177. Unless Defendants are temporarily and permanently enjoined from engaging further in the acts and practices complained of herein, Defendants' actions will continue to result in irreparable injury to the public for which there is no adequate remedy at law.

**Claims Brought by the State of Illinois Pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act**

## VIOLATIONS OF ILLINOIS LAW

### The Illinois Consumer Fraud Act

178. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ILCFA") states, in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" … in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

179. Section 7 of the Consumer Fraud Act provides:

> (a) Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction, revocation, forfeiture or suspension of any license, charger, franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver, dissolution of domestic corporations or association suspension or termination of the right of foreign corporation or associations to do business in this State; and restitution.
>
> (b) In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act. In the event the court finds the method, act or practice to have been entered into with the intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

815 ILCS 505/7.

180. Section 10 of the ILCFA provides, "[i]n any action brought under the provisions of this Act, the Attorney General is entitled to recover costs for the use of this State." 815 ILCS

505/10.

**Illinois Uniform Deceptive Trade Practices Act**

181. Section 2 of the Illinois Uniform Deceptive Trade Practices Act provides, in relevant part, the following:

> (a) a person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:
>
> ***
>
> (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;
>
> ***
>
> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;
>
> ***
>
> (9) advertises goods or services with intent not to sell them as advertised;
>
> ***
>
> (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 ILCS 510/2(a).

> (b) In order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.

815 ILCS 510/2(b).

**<u>COUNT XI</u>**

**Violations of The Illinois Consumer Fraud Act**
**(Deception)**

182. The People of the State of Illinois re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

183. In numerous instances in the course of trade or commerce, Defendants engaged in unfair or deceptive acts and practices declared unlawful by Section 2 of the ILCFA, including:

A. Misrepresenting, directly or indirectly, expressly or by implication, with the intent that consumers rely on the misrepresentation that under certain plans, Toast hardware is “$0”;

B. Advertising to restaurants that they will pay $0 upfront for 1-2 terminals in their Starter Kit plan with the intent to charge restaurants upfront for the second terminal, in violation of 815 ILCS 510/2(a)(9); and

C. Causing confusion or misunderstanding as to how many payment terminals are “$0” in the starter kit model in violation of 815 ILCS 510/2(a)(12).

**<u>COUNT XII</u>**

**Violations of The Illinois Consumer Fraud Act**
**(Deception)**

184. The People of the State of Illinois re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

185. In numerous instances in the course of trade or commerce, Defendants engaged in unfair or deceptive acts and practices declared unlawful by Section 2 of the ILCFA, including misrepresenting, directly or indirectly, expressly or by implication, with the intent that consumers rely on the misrepresentation that Defendants provide customer support 24/7/365.

186. In truth and in fact, in numerous instances, Defendants’ customer support agents are unavailable or lack even basic knowledge about Toast’s products and services, much less the ability to provide solutions or support.

187. The above acts and practices are also violations of Section 2(a)(5) of the Uniform Deceptive Trade Practices Act because Defendants represent that their customer service has characteristics, *i.e.* the extent of its availability, that it does not have. 815 ILCS 510(a)(5).

188. The above acts and practices are also violations of Section 2(a)(7) of the Uniform Deceptive Trade Practices Act because Defendants represent that their customer service is of a particular standard or model, *i.e.* 24/7/365, when their customer service does not meet this standard or model. 815 ILCS 510(a)(7).

189. The above acts and practices are also violations of Section 2(a)(9) of the Uniform Deceptive Trade Practices Act because Defendants advertised their customer service with the intent not to provide it as advertised. 815 ILCS 510/2(a)(9). Violations of the Uniform Deceptive Trade Practices Act are unlawful acts under the ILCFA. 815 ILCS 505/2.

**COUNT XIII**

**Violations of The Illinois Consumer Fraud Act**
**(Unfairness)**

190. The People of the State of Illinois re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

191. A practice is unfair under Section 2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, if it is contrary to public policy, is immoral, unethical, oppressive or unscrupulous, and/or is likely to cause substantial injury to consumers.

192. In numerous instances, Defendants have charged consumers for fees for which consumers have not provided express, informed consent.

193. Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition, in violation of 815 ILCS 505/2.

**Claims Brought by the State of Iowa, *ex rel.* Brenna Bird, Attorney General**

**Count XIV**

**Violation of the Iowa Consumer Fraud Act, Iowa Code § 714.16**

194. Plaintiff State of Iowa re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

195. The Iowa Consumer Fraud Act makes unlawful "[t]he act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise . . . whether or not a person has in fact been misled, deceived, or damaged." Iowa Code § 714.16(2)(a).

196. The Iowa Attorney General is authorized to bring an action against any person

who violates the Iowa Consumer Fraud Act for injunctive relief, reimbursement for consumers, disgorgement of ill-gotten gains, civil penalties, and attorneys' fees and costs. Iowa Code §§ 714.16 (7) and (11).

197. Defendants' acts or omissions as alleged herein have occurred with respect to business done in Iowa and have affected Iowa consumers.

198. Defendants' acts or omissions as alleged herein constitute unlawful practices in violation of the Iowa Consumer Fraud Act. *See* § 714.16(2)(a).

199. The Court should award all relief allowable under Iowa Consumer Fraud Act against Defendants, including injunctive relief, reimbursement for Iowa consumers, disgorgement of ill-gotten gains, civil penalties, attorneys' fees and costs, and any other relief the Court may grant. Iowa Code §§ 714.16 (7) and (11).

**Claims Brought by the State of Nebraska, *ex rel.* Michael T. Hilgers, Attorney General, Pursuant to the Nebraska Uniform Deceptive Trade Practices Act**

**Count XV**
**(Deceptive Practices)**

200. Plaintiff Nebraska re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

201. The Nebraska Uniform Deceptive Trade Practices Act ("NE UDTPA") specifies multiple acts or practices which, when conducted in the course of business, constitute deceptive trade practices, including but not limited to: representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have," and advertising "goods or services with intent not to sell them as advertised or advertises the price in any manner calculated or tending to mislead or in any way deceive a person[.]" Neb. Rev. Stat. § 87-302(a).

202. The Attorney General is authorized to bring an action against any person who violates NE UDTPA for injunctive relief, restitution for Nebraska consumers, and civil penalties.

Neb. Rev. Stat. §§ 87-303.05, 87-303.11.

203. In numerous instances, as described in the preceding paragraphs, in connection with the advertising, marketing, promotion, or offering for sale of goods or services in Nebraska, Defendants made false or misleading representations and advertisements, directly or indirectly, expressly or by implication, regarding Toast products and services, including, but not limited to, that under certain plans, Toast hardware is "$0.

204. In fact, the representations set forth in Paragraph 203 are false, misleading, or not substantiated at the time the representations were made.

205. Defendants' acts or omissions constitute deceptive acts or practices in the course of business in violation of the Nebraska Uniform Deceptive Trade Practices Act. *See* Neb. Rev. Stat. § 87-302(a).

206. Defendants engaged in the above deceptive acts and practices willfully, knowing them to be deceptive.

207. Defendants' false or misleading representations have affected the people of the State of Nebraska.

208. Each deceptive act or practice as alleged herein constitutes a separate violation of the NE UDTPA.

209. The Court should award all relief allowable under NE UDTPA against Defendants, including injunctive relief, restitution for Nebraska consumers, and civil penalties for each violation. Neb. Rev. Stat. §§ 87-303.05, 87-303.11.

**<u>Count XVI</u>**
**(Deceptive Practices)**

210. Plaintiff Nebraska re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

211. The Nebraska Uniform Deceptive Trade Practices Act ("NE UDTPA") specifies

multiple acts or practices which, when conducted in the course of business, constitute deceptive trade practices, including but not limited to: representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have," and advertising "goods or services with intent not to sell them as advertised or advertises the price in any manner calculated or tending to mislead or in any way deceive a person[.]" Neb. Rev. Stat. § 87-302(a).

212. The Attorney General is authorized to bring an action against any person who violates NE UDTPA for injunctive relief, restitution for Nebraska consumers, and civil penalties. Neb. Rev. Stat. §§ 87-303.05, 87-303.11.

213. In numerous instances, as described in the preceding paragraphs, in connection with the advertising, marketing, promotion, or offering for sale of goods or services in Nebraska, Defendants made false or misleading representations and advertisements, directly or indirectly, expressly or by implication, regarding Toast products and services, including that Defendants provide customer support 24/7/365.

214. In truth and in fact, in numerous instances, Defendants' customer support agents are unavailable or lack even basic knowledge about Toast's products and services, much less the ability to provide solutions or support.

215. Defendants' acts or omissions constitute deceptive acts or practices in the course of business in violation of the Nebraska Uniform Deceptive Trade Practices Act. *See* Neb. Rev. Stat. § 87-302(a).

216. Defendants engaged in the above deceptive acts and practices willfully, knowing them to be deceptive.

217. Defendants' false or misleading representations have affected the people of the

State of Nebraska.

218. Each deceptive act or practice as alleged herein constitutes a separate violation of the NE UDTPA.

219. The Court should award all relief allowable under NE UDTPA against Defendants, including injunctive relief, restitution for Nebraska consumers, and civil penalties for each violation. Neb. Rev. Stat. §§ 87-303.05, 87-303.11.

**Claims Brought by the State of Utah Pursuant to the Utah Truth in Advertising Act**

**<u>Count XVII</u>**
**(Deceptive Trade Practices)**

220. The state of Utah re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

221. In numerous instances in connection with the advertising, marketing, promotion, or offering for sale, or sale of Toast goods and services, Defendants represent, directly or indirectly, expressly or by implication that under certain plans, Toast hardware is "$0".

222. In fact, Defendants' representations in Paragraph 221 are false, misleading, or not substantiated at the time the representations were made.

223. Defendants' representations in Paragraph 221 occurred in the course of its business.

224. Defendants' representations in Paragraph 221 constitute a deceptive trade practice in violation of Utah Code § 13-11a-3(e), which prohibits a person from representing that goods or services have characteristics, benefits, or qualities that they do not have.

225. Defendants' representations in Paragraph 221 constitute a deceptive trade practice in violation of Utah Code § 13-11a-3(i), which prohibits a person from advertising goods or services or the price of goods or services with intent not to sell them as advertised.

**<u>Count XVIII</u>**

**(Deceptive Trade Practices)**

226. The state of Utah re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

227. In numerous instances in connection with the advertising, marketing, promotion, or offering for sale, or sale of Toast goods and services, Defendants represent, directly or indirectly, expressly or by implication that Defendants provide customer support 24/7/365.

228. In truth and in fact, in numerous instances, Defendants' customer support agents are unavailable or lack even basic knowledge about Toast's products and services, much less the ability to provide solutions or support.

229. Defendants' representations in Paragraph 227 occurred in the course of its business.

230. Defendants' representations in Paragraph 227 constitute a deceptive trade practice in violation of Utah Code § 13-11a-3(e), which prohibits a person from representing that goods or services have characteristics, benefits, or qualities that they do not have.

231. Defendants' representations in Paragraph 227 constitute a deceptive trade practice in violation of Utah Code § 13-11a-3(i), which prohibits a person from advertising goods or services or the price of goods or services with intent not to sell them as advertised.

232. The Attorney General of the State of Utah brings this action in the name of the State of Utah and on behalf of the people of the State of Utah pursuant to the authority granted by Utah Code § 13-11a-4(1)(a)(i).

233. On September 11, 2026, the Attorney General of the State of Utah gave Toast a 10-day notice to correct required prior to bringing an action for injunctive relief under Utah Code § 13-11a-4.

234. Utah seeks all remedies under federal law and the Utah Truth in Advertising Act including, without limitation, the following:

a. Damages for persons in the state of Utah pursuant to Utah Code § 13-11a-4(1)(a)(i);

b. The greater of actual damages or $2,000 per act or practice in violation of Utah Code 13-11a-1, *et seq.*, pursuant to Utah Code § 13-11a-4(1)(b);

c. Civil penalties in the amount of $2,000 per act or practice in violation of Utah Code 13-11a-1, *et seq.*, pursuant to Utah Code § 13-11a-4(1)(b);

d. Injunctive relief pursuant to Utah Code § 13-11a-4(1)(a);

e. Costs and attorneys' fees pursuant to Utah Code § 13-11a-4(1)(c); and

f. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Claims Brought by the Oklahoma Attorney General Pursuant to the Oklahoma Consumer Protection Act**

**COUNT XIX**
**(False Representations as to Characteristics, Uses, and Benefits)**

228. The Oklahoma Attorney General incorporates the preceding paragraphs as if they were fully alleged herein.

229. Defendants are persons within the meaning of the Oklahoma Consumer Protection Act pursuant to Okla. Stat. tit. 15, § 752(1) because each is a corporation or other legal entity.

230. The subscription services, point-of-sale hardware and software, payment processing services, payroll services, online ordering services, and Toast Capital Loans that Defendants advertise, offer for sale, and sell, as set forth above, are the subjects of consumer transactions pursuant to Okla. Stat. tit. 15, § 752(2) because they are advertised, offered for sale, sold, or distributed for purposes that are personal, household, or business oriented.

231. Defendants, as set forth above, in the course of Defendants' business, knowingly or with reason to know, made false representations as to the characteristics, uses, and benefits of the subjects of consumer transactions, in violation of Okla. Stat. tit. 15, § 753(5). These false representations include representations, directly or indirectly, expressly or by implication:

a. that under certain pricing plans, Toast hardware is "$0", Toast hardware is "$0" and "$0/mo"; and

b. that Defendants provide customer support "24/7/365."

232. Defendants made these representations knowingly or with reason to know that they were false in the course of their business.

**COUNT XX**
**(Unfair Trade Practices)**

233. The Oklahoma Attorney General incorporates the preceding paragraphs as if they were fully alleged herein.

234. Defendants' practices, as set forth above, constitute unfair trade practices made in the course of Defendants' business that violate the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 753(21).

235. Defendants' practices constitute unfair trade practices under Okla. Stat. tit. 15, § 752(14) because they offend established public policy; because they are oppressive and unscrupulous; and because they are substantially injurious to consumers.

236. Defendants' practices substantially harmed consumers, who paid for subscription services they did not want or had already cancelled, were charged early termination fees and accelerated loan repayments they did not expect, and remained locked into unwanted subscriptions because of the difficulty and cost of cancelling. Defendants' practices also harmed restaurant patrons, who paid an Order Processing Fee they could not avoid, and Oklahoma restaurants, whose patrons attributed Defendants' fee to the restaurants themselves.

**COUNT XXI**
**(Deceptive Trade Practices)**

237. The Oklahoma Attorney General incorporates the preceding paragraphs as if they were fully alleged herein.

238. Defendants' practices, as set forth above, constitute deceptive trade practices made in the course of Defendants' business that violate the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 753(21).

239. Defendants' practices constitute deceptive trade practices under Okla. Stat. tit. 15, § 752(13) because they are misrepresentations, omissions, or other practices that have deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person.

240. Defendants' deceptive practices could reasonably be expected to deceive consumers, and did deceive consumers, to their detriment.

241. Defendants' practices, as set forth above, should be declared acts or practices that violate the Oklahoma Consumer Protection Act pursuant to Okla. Stat. tit. 15, § 756.1(A)(1).

242. Defendants should be enjoined and restrained from violating the Oklahoma Consumer Protection Act pursuant to Okla. Stat. tit. 15, § 756.1(A)(2).

243. Defendants should be ordered to pay restitution and other equitable relief in the amounts that they have wrongfully received by means of their unlawful practices described above to Oklahoma consumers, including Oklahoma restaurants and the patrons of Oklahoma restaurants who paid the Order Processing Fee, pursuant to Okla. Stat. tit. 15, § 756.1(A), (C).

244. Defendants should further be ordered to disgorge all revenues, profits, and other benefits obtained from Oklahoma consumers as a result of the unlawful practices described herein, in order to prevent unjust enrichment and to effectuate the purposes of the Oklahoma Consumer Protection Act pursuant to Okla. Stat. tit. 15, § 756.1(A)(2) and the Court's inherent equitable powers.

245. Defendants should be ordered to pay civil penalties in the amount of Ten Thousand Dollars ($10,000) per violation of the Oklahoma Consumer Protection Act, in addition to other penalties that may be imposed by the Court, pursuant to Okla. Stat. tit. 15, § 761.1(C).

246. Defendants should be ordered to pay the reasonable expenses, attorney's fees, and investigation fees incurred pursuant to Okla. Stat. tit. 15, §§ 756.1(A)(4), 761.1(D).

## CONSUMER INJURY

235. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, ROSCA, and state consumer protection laws. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, and the above-enumerated state consumer protection laws;

B. Award monetary and other relief within the Court's power to grant;

C. Award Plaintiff States civil penalties, damages, restitution and/or forfeitures for each violation of their respective state laws, as well as attorneys' fees, costs, and expenses as provided under state law; and

D. Award any additional relief as the Court determines to be just and proper.

Dated: October 29, 2026

Respectfully submitted,

**FOR PLAINTIFF FEDERAL TRADE COMMISSION:**

*/s/ Stephanie E. Liebner*

Stephanie E. Liebner (VA Bar No. 90647)
Carlton B. Mosley (DC Bar No. 1644552)
Sally Tieu (CA Bar No. 346034)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Stop GAO-5K21
Washington, DC 20580
Phone: (202) 640-0963 (Liebner)

Email: sliebner@ftc.gov (Liebner)
Fax: (202) 326-3395

*Attorneys for Plaintiff*
*Federal Trade Commission*

**FOR PLAINTIFF THE PEOPLE OF THE STATE OF CALIFORNIA:**

*/s/ Jon Scott Kuhn*
DAWYN R. HARRISON, County Counsel
JON SCOTT KUHN, Assistant County Counsel (CA SBN 190517)
skuhn@counsel.lacounty.gov
ANDREA ROSS, Principal Deputy County Counsel (CA SBN 179398)
aross@counsel.lacounty.gov
HANNAH FLORES, Senior Deputy County Counsel (CA SBN 305873)
hflores@counsel.lacounty.gov
PETER S. LEE, Senior Deputy County Counsel (CA SBN 290846)
plee@counsel.lacounty.gov
OFFICE OF THE COUNTY COUNSEL
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, CA 90012-2713
Telephone: (213) 808-8747 (Kuhn)
Facsimile: (213) 680-2165

CHRISTINA TUSAN (CA SBN 192203)
ctusan@ctusanlaw.com
ADRIAN BARNES (CA SBN 253131)
abarnes@ctusanlaw.com
TUSAN LAW, P.C.
680 E. Colorado Blvd., #180
Pasadena, CA 91101
Telephone: (626) 418-8203

*/s/ Sara J. Eisenberg*
DAVID CHIU (SBN 189542)
City Attorney
YVONNE R. MERÉ (SBN 175394)
Chief Deputy City Attorney
SARA J. EISENBERG (SN 269303)
Chief of Complex and Affirmative Litigation
RONALD H. LEE (SBN 238720)
Asst. Chief of Complex and Affirmative Litigation
JESSE E. LANIER (SBN 303395)
Deputy City Attorney
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5402
Telephone: (415) 554-3935
Facsimile: (415) 437-4644
Sara.Eisenberg@sfcityatty.org
Ronald.Lee@sfcityatty.org
Jesse.Lanier@sfcityatty.org

*Attorneys for Plaintiff*
*The People of the State of California*

**FOR PLAINTIFF ATTORNEY GENERAL OF COLORADO:**

PHILIP J. WEISER
Attorney General
State of Colorado

*/s/ Brady J. Grassmeyer*
Brady J. Grassmeyer (*pro hac vice* forthcoming)
Senior Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Email: Brady.Grassmeyer@coag.gov
Telephone: (720) 508-6263

*Attorneys for Plaintiff*
*Attorney General of Colorado*

**FOR PLAINTIFF OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS:**

JAMES UTHMEIER
Attorney General

*/s/ Jennifer H. Pinder*
Jennifer Hayes Pinder (FBN 017325)
Bureau Chief, Tampa (*pro hac vice* forthcoming)
Consumer Protection Division
Jennifer.Pinder@myfloridalegal.com
3507 East Frontage Road, Suite 325
Tampa, Florida 33607
(813) 287-7950

*Attorneys for Plaintiff Attorney General of Florida*

**FOR PLAINTIFF THE PEOPLE OF THE STATE OF ILLINOIS**

*/s/ Hal B. Dworkin*
HAL B. DWORKIN, IL Bar No. 6318213
(*pro hac vice* forthcoming)
Senior Assistant Attorney General
Monica Grubbs, IL BAR NO. 6277581
Assistant Attorney General
Office of the Illinois Attorney General
Consumer Protection Division
Consumer Fraud Bureau
115 South LaSalle Street
Chicago, IL 60603
(312) 814-5159
Hal.Dworkin@ilag.gov
Monica.Grubbs@ilag.gov

*Attorneys for Plaintiff*
*The People of the State of Illinois*

**FOR PLAINTIFF STATE OF IOWA:**

BRENNA BIRD
Attorney General of Iowa

*/s/ Daniel L. Barnes*
Daniel L. Barnes (*pro hac vice* forthcoming)
Deputy Attorney General for Consumer Protection
Hoover State Office Bldg.
1305 E. Walnut St.
Des Moines, Iowa 50319
(515) 281-8772
daniel.barnes@ag.iowa.gov

*Attorney for Plaintiff*
*The State of Iowa*

**FOR PLAINTIFF STATE OF NEBRASKA:**

MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ Michael Greenlee
MICHAEL GREENLEE (NE #24333) (*pro hac vice* forthcoming)
Assistant Attorney General
Consumer Protection Bureau Chief
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68508
Telephone: (402) 471-3840
Fax: (402) 471-4725
michael.greenlee@nebraska.gov

*Attorney for Plaintiff State of Nebraska*

**FOR PLAINTIFF STATE OF UTAH:**

DEREK BROWN
Attorney General

DOUGLAS CRAPO
Deputy Attorney General,
Public Protection Department

_/s/ Marie W.L. Martin_
MARIE W.L. MARTIN, CBN 189219
Division Director, Antitrust & Data Privacy Division
Utah Office of the Attorney General
160 E, 300 S, 5th Floor
Salt Lake City, UT 84114-0830
(801) 366-0260
mwmartin@agutah.gov

*Attorneys for Plaintiff State of Utah*

**FOR PLAINTIFF ATTORNEY GENERAL OF OKLAHOMA:**

<u>*/s/ Cameron R. Capps*</u>
Cameron R. Capps, OBA No. 32742 (*pro hac vice* forthcoming)
Christopher. J. Campbell, OBA No. 33649 (*pro hac vice* forthcoming)
Sylvia A. Lanfair, OBA No. 30144 (*pro hac vice* forthcoming)
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 522-1260
Fax: (405) 521-3921
Cameron.Capps@oag.ok.gov
Chris.Campbell@oag.ok.gov

*Attorneys for Plaintiff*
*Attorney General of Oklahoma*